**IMPERIAL PACKAGING CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 79-9-01482.**

United States Court of International Trade.

Nov. 30, 1981.

Tompkins & Davidson, New York City (Edward B. Ackerman, New York City, of counsel), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, New York City, Atty. in Charge, Intern. Trade Field Office, Susan Handler-Menahem, Teaneck, N. J., for defendant.

NEWMAN, Judge:

Plaintiff contests the classification by Customs at the port of Los Angeles, California of certain plastic (polyethylene) bags imported from Taiwan in April 1979. Customs classified the bags under the provision in item 774.60, TSUS, for "Other" articles not specially provided for, of rubber or plastics, and assessed duty at the rate of 8.5 per centum ad valorem. Plaintiff claims that the plastic bags are entitled to duty-free entry under the provision in item A772.20,

TSUS for "[c]ontainers, of rubber or plastics, with or without their closures, chiefly used for the packing, transporting, or marketing of merchandise." The parties have stipulated that if the bags are classifiable as claimed, all the requirements for tariff treatment under the Generalized System of Preferences have been satisfied. See 19 U.S.C. § 2461 *et seq.*; General Headnote 3(c), TSUS.

## THE RECORD

This action was submitted by the parties upon an agreed statement of facts without trial. In essence, the parties have stipulated that:

The imported bags were sold by plaintiff to J.C. Penney, a chain of retail stores, whose name is imprinted on the bags. Penney used the imported bags to enclose articles sold by the store; and the bags were used by Penney's customers to carry the purchased articles from the retail store to the customers' desired destination. Additionally, the plastic bags were used by Penney to provide some indicia that the purchased goods placed in the bags had been paid for, and consequently the bags were a means of security to prevent shoplifting, particularly when the bags were secured with staples or tape. Further, the name of the retail store, printed on the bags, served the function of advertising the store. It should be noted that merchandise was not shipped to Penney in the bags, nor was merchandise displayed at retail in the bags.

After the bags were used as described, the bags, of course, may have been utilized by consumers for various purposes both inside and outside the home, or they may have been discarded after serving their original purpose.

The record also includes as the sole exhibit a representative sample of the imported merchandise, which is attached to the complaint, such sample comprising a plastic bag with the name "J.C.Penney" imprinted thereon.

## THE ISSUES

The dispute between the parties is focused on whether the imported articles are containers for "merchandise" within the meaning of that term in the statute; and whether the imported bags were chiefly used for the purposes specified in the statute.

## OPINION

Central to the dispute is the construction of the term "merchandise" as used in item 772.20, TSUS. Plaintiff maintains that "goods do not automatically cease to be merchandise at the time of departure from the seller's place of business, even to the ultimate consumer" (Brief, p. 16). Defendant, however, argues that the term "merchandise" as used in item 772.20 refers to products which are still in the "stream of commerce," rather than articles which are personal effects or commodities in the hands of the ultimate consumer.

I agree with defendant's construction of the term "merchandise". *Cf. United States v. Mattio*, 17 F.2d 879 (9th Cir. 1927); *United States v. Julian Roberts*, 23 CCPA 300, 305, T.D. 48166 (1936). See also *Will & Baumer Candle Co. v. United States*, 37 CCPA 27, C.A.D. 414 (1949); *Poland Brothers Inc. v. United States*, 64 Cust.Ct. 248, C.D. 3986 (1970). Significantly, the subject plastic bags were not used to contain articles in the stream of commerce; they were not used to transport goods to a retail store; nor were they used to exhibit articles for sale in the store. Indeed, the plastic bags were utilized by Penney only at the point of sale after the articles were in the hands of the ultimate consumer destined for his home. Patently, at that juncture the marketing process had terminated.[1] See *Koret of California v. United States*, 66 Cust.Ct. 373, C.D. 4217 (1971). Hence, I agree with defendant's contention that the purchased articles had left the stream of commerce,

---

1. Whether purchased articles are placed in bags before, during or after the articles are paid for, it is clear that the retail store does not intend to release the bag and its contents until after the articles have been purchased.

and were no longer "merchandise" within the meaning of that term as used in the statute.

An examination of the *Summary of Trade and Tariff Information*, TSUS items 772.20, 772.85, and 772.86 (April 1981)[2] prepared by the United States International Trade Commission bolsters the conclusion that item 772.20 was not intended to encompass merchandise bags which retail stores furnish to their customers for carrying purchases home. Thus, the *Summary* states (at pages 2 and 10):

> Plastics containers serve the dual function of helping to protect and of selling the product. With the ascendancy of the self-service department stores and supermarkets, goods are openly displayed and are expected to sell themselves. Thus, the package has replaced the sales clerk. These containers are used to package nearly every good imaginable from hardware and bakery goods to electric components and dairy products. They compete against traditional packaging products, including glass bottles, metal cans, wooden pallets, paper bags, and paperboard cases, as well as against one another. In addition, the plastics are frequently combined with one another and with traditional materials by means of coatings, laminations, and coextrusions to obtain a mix of properties not available in any single material or available only at an unacceptable cost. There are a number of product areas for these containers from which plastics would be excluded were it not for the combinations of plastics with plastics or plastics with traditional materials. Another unique feature of the products covered herein is that in and of themselves they serve no further function. For example, after the milk within the gallon plastics container has

been consumed, the container serves no purpose and is usually thrown away. Naturally, therefore, price is a critical factor in choosing plastics, other materials, or some combination thereof.

\* \* \* \* \* \*

> Bags and similar nonrigid articles which are not covered here under TSUS item 772.20 include disposable household bags such as garbage and garden bags, sandwich bags, and food bags. *Also excluded are any bags furnished "at the point of sale," such as drycleaning garment bags and merchandise bags which department stores furnish to customers for carrying purchases home.* Clear plastic bags for produce, usually in rolls on elevated racks and perforated for easy removal, are also excluded if used in the supermarket at the point of sale. The above-described plastics bags enter under TSUS item 774.55, and also will be covered under a summary on miscellaneous rubber and plastics products. [Emphasis added.]

In a word, then, the imported bags do not come within the intended scope of item 772.20. They are not used to market or sell a product or protect a product so that it might be sold. Rather, after the product has been sold, the imported bags are used by the ultimate consumer to carry the product home. To repeat, at the point of sale the purchased product contained within the bag is not "merchandise" within the meaning of the statute, but is a personal effect.

Finally, the Court agrees with defendant's contention that the record fails to establish the *chief use* of the plastic bags in light of the several uses for the bags as stipulated by the parties. *Cf. Poland Brothers, supra,*

---

**2.** While not part of the legislative history of the TSUS, the *Summaries* have repeatedly been consulted by the Courts as an aid in determining the scope of tariff provisions. *See e.g. Hawaiian Motor Co. v. United States,* 67 CCPA ——, C.A.D. 1241, 617 F.2d 286 (1980); *Sortex Co. of North America v. United States,* 80 Cust.Ct. 134, 138, C.D. 4746, 453 F.Supp. 644 (1978), *aff'd* 66 CCPA ——, C.A.D. 1221, 596

F.2d 1002 (1979); *American Bristle & Hair Drawing Co., Keer Maurer & Co. v. United States,* 59 CCPA 104, 108, C.A.D. 1048, 458 F.2d 524, 527 (1972); *Tanross Supply Co. Inc. v. United States,* 58 CCPA 26, 31, C.A.D. 1000, 433 F.2d 1332, 1336 (1970). See also *Lyons Export & Import, Inc. v. United States,* 59 CCPA 142, 144, C.A.D. 1056, 461 F.2d 830, 831 (1972).

For the foregoing reasons, this action is dismissed.

Judgment will be entered accordingly.